## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
NANCY JODOIN,                          )
              Plaintiff,               )
                                       )
vs.                                    )        **CIVIL ACTION**
                                       )        **NO. 08-40037-TSH**
BAYSTATE HEALTH SYSTEMS, INC.          )
and Lorri Horton,                      )
              Defendant.               )
                                       )
_____)

## ORDER AND MEMORANDUM OF DECISION
### March 29, 2010

**HILLMAN, M. J.**

### Nature of the Proceeding

By consent of the parties this case has been referred to me for  all further proceedings, including trial, and order for entry of a final judgment in accordance with the provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73(b).  This Memorandum of Decision addresses the following motions:

1.     Motion For Summary Judgment (Docket No. 34);

2.     Motion To Strike Portions Of The Affidavit Of Plaintiff Nancy Jodoin In Support Of Her Opposition To Defendants' Motion for Summary Judgment (Docket No. 51); and

3.     Motion To Strike Portions Of The Affidavit Of  Elaine Miner In Support Of Plaintiff's Opposition To Defendants' Motion For Summary Judgment (Docket No. 52).

**Nature of the Case**

Nancy Jodoin ("Plaintiff" or "Ms. Jodoin") has filed an Amended Complaint against

Baystate Health System, Inc. ("Baystate Health") and Lorri Horton ("Ms. Horton") alleging

federal claims under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"),

the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Employee Retirement

Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and state law claims under the

Massachusetts Anti-Discrimination Statute, Mass.Gen.L. ch.151B ("Chapter 151B"),

Mass.Gen.L. ch. 214 § 3A, and the Massachusetts right of privacy statute, Mass.Gen.L. ch. 214 §

1B.

**The Motions To Strike**

Before addressing the Defendants' motion for summary judgment, I will address

Defendants' motions to strike portions of two affidavits which were submitted in support of the

Plaintiff's opposition.  Specifically, Ms. Jodoin's affidavit and the affidavit of Elaine Minor.

*Whether Portions of Ms. Jodoin's Affidavit Should be Stricken*

The Defendant asserts that in her affidavit, Ms. Jodoin has improperly presented evidence

of medical diagnoses made by her treating physician.  Defendant seeks to strike paragraph 19 of

Ms. Jodoin's affidavit and any references to the same in her concise statement of material facts.

Paragraph 19 of Ms. Jodoin's affidavit states:

In May 2007 I experienced a severe reaction to a new headache medication I had
been prescribed.  The severity of the reaction caused me to visit the emergency
room on May 13, 2007.  I was told by the emergency room doctor that I should
not go to work the next day and schedule [sic.] an appointment to see my primary
care physician immediately.  After seeing my primary care physician I was
diagnosed with new onset hypertension due to job stress.  As a result, I could not
return to work until my blood pressure levels came down and so I began an
FMLA leave on May 14, 2007.

*Pl's Concise Statement of Disputed Material Facts In Supp. Of Opp. To Defs' Mot. For Sum. J.*
(Docket No. 47)("*Pl's Facts*"), at *Ex. 1, p. 5.*

In the first two sentences of Paragraph 19, Ms. Jodoin simply describes her symptoms and the actions she took as a result thereof; the statements do not assert a medical diagnosis and are not hearsay. The third sentence clearly constitutes hearsay and is stricken. The Fourth sentence does assert a medical diagnosis– which Ms. Jodoin certainly learned from her treating physician. The statement is hearsay and is stricken. I do not find that the last sentence constitutes hearsay.

### Whether Portions of Elaine Miner's Affidavit should be Stricken

The Defendant seeks to strike Paragraphs 6, 7, 8 and 9 of Elaine Minor's affidavit on the grounds that the statements made therein do not comply with Rule 56(e), in that Ms. Minor makes wholly conclusory statements without proper factual foundation and fails to establish that her factual assertions are based on first hand knowledge. I agree with the Defendants as to paragraphs 7-9 and therefore, they shall be stricken. Defendants' request to strike paragraph 6 is *denied*.

### **Standard of Review**

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse*

*of Florida, LLC*, 575 F.3d 145, 152 (1ˢᵗ Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1ˢᵗ Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing*, 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.*, at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or " improbable inferences". *Id.* (citation to quoted case omitted). " 'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

**<u>Facts</u>**

*<u>Background Facts</u>*

Baystate Health was established with the goal of providing an integrated health care delivery system in Western Massachusetts. *Defendants' Statement of Undisputed Facts* (Docket No. 36) ( "*Defs' Facts*")**,** at ¶1.  There are numerous distinct entities within the Baystate Health umbrella, including non-profit tax exempt entities (such as the Baystate Mary Lane Hospital, Baystate Franklin Medical Center and Baystate Medical Center ) and "for profit" entities (such as BH Ambulance, Inc. and Health New England).  *Id.*  Baystate Health also owns and operates numerous physician practices, including primary care, specialty care and hospital-based physician services.  *Id.*  Baystate Administrative Services, an entity separate from Baystate Health, provides various administrative services as needed, including billing, marketing, and Human Resources support.  *Id.*

The physician practice, Mary Lane OB/GYN (the "Practice"), operates a small office in Ware, MA.  *Id.* at ¶2.  During the relevant time period, there were six exam rooms operating at the Practice and the Practice's employees included two physicians, three employees who performed clerical duties (e.g. scheduling appointments, answering phone calls, etc.), one or two registered nurses working as practice nurses, a medical assistant who performed necessary clinical duties and, at times, a licensed practical nurse ("LPN").  *Id.,* at ¶¶2, 45 & 47.  If a practice nurse performed satisfactorily,  s/he would be promoted to a "patient care coordinator," a patient care coordinator performed the duties of a practice nurse and had some additional administrative and supervisory duties.  *Id.*

Ms. Jodoin joined Baystate Health in 2000 as a clinical nurse. *Plaintiff's Revised Concise Statement of Disputed Material Facts in Support of Opposition to Defendants' Motion for Summary Judgment* (Docket No. 58) ("*Pl's Rev. Facts*"), at *Undisp. Facts* ¶2. In 2003, she transferred to the Practice and began work as a practice nurse. *Id.* In 2005, she was promoted to Patient Care Coordinator. *Id.* Ms. Jodoin clinically assisted one of the practice physicians, Dr. Ahmed, on a regular basis, coordinated the workload of Practice staff, and assisted with clinical duties such as taking blood pressures, giving injections and assisting in medical procedures and OB intakes. *Defs' Facts,* at ¶47.

Ms. Jodoin was born with a medical condition known as congenital nystagmus. *Defs' Facts*, at ¶4. Nystagmus is characterized by involuntary eye movements that can affect visual acuity. In order to see effectively, individuals with nystagmus must hold their heads in a certain position, called the null point. *Id.* Despite having nystagmus, Ms. Jodoin's vision remained relatively stable, with only minor changes, through September 2006. *Id.* at ¶40. Though Ms. Jodoin's condition required some accommodations during her education (e.g. seat location, type of microscope), she obtained a degree as a registered nurse and was licensed as a registered nurse by the Commonwealth of Massachusetts in 1995. *Id.* at ¶39; *Pl's Rev. Facts*, at *Undisp. Facts* ¶1. Since the time of her licensing until her commencement of leave under the FMLA, Ms. Jodoin worked continuously as a nurse. *Id.*

Ms. Horton has been the Practice Manager for the Practice since 2002. *Defs' Facts*, at ¶ 43. Ms. Horton, who had managerial responsibilities for a number of facilities and supervised approximately thirty employees, generally spent about two days a week at the Ware location.

*Id.*, at ¶44.  For the entire period that Ms. Jodoin worked for the Practice, she was supervised by Ms. Horton.  *Id.,* at ¶43.

Each February, Ms. Horton completed an Employee Performance Evaluation of Ms. Jodoin for the preceding calendar year.  *Id.,* at ¶29.  For the years 2004-2007, Ms. Horton rated Ms. Jodoin as an "Exemplary Employee" overall and included written positive narratives.  *Id.* Ms. Horton completed the 2007 year review in February 2008, when Ms. Jodoin was on extended medical leave.  *Id.*  Ms. Jodoin received consistent wage increases throughout the period of her employment.  *Id.*, at ¶97.

*Facts Relating To ADA And Chapter 151B Discrimination And Retaliation Claims*

In early 2006, the Practice planned to implement a new medical records system that would involve replacing desktop monitors with a tablet-based electronic medical records system. *Defs' Facts*, at ¶32.  In December of 2005, prior to the implementation of the new system and in response to a concern that Ms. Jodoin may have difficulty using the tablets, Ms. Horton initiated a meeting to discuss the possibility of Ms. Jodoin continuing to use a full-size monitor instead of the smaller tablets along with a mobile push cart that Ms. Jodoin would use to transport the monitor between exam rooms.  *Defs' Facts,* at ¶¶56,57.[1]  Present at the meeting were Ms.

---

[1] Ms. Jodoin originally filed *Pl's Concise Statement Of Disputed Material Facts In Sup. Of Opp. To Defs' Mot. For Sum. J.* (Docket No. 47), which was stricken, in part, for failure to comply with this Court's LR, D.Mass. 56.1. In response,  Ms. Jodoin  filed *Pl's Rev. Facts.*  Ms. Jodoin's revised statement of facts, while marginally more compliant with this Court's rules, is deficient in several respects.  First, Ms. Jodoin defined terms in the original filing and then, without notice, used a different defined term in the revised filing (for example*.,* the defined term for her deposition testimony in the original filing was "Jodoin", while in the revised filing, she used the define term "Pl.").  Second, and more problematic,  are the number of facts disputed/asserted by Ms. Jodoin as to which she has either failed to cite support in the record, or has cited a part of the record which simply does not support her contention.  For example, Ms. Jodoin,  citing to page 100 of her deposition testimony, disputes the Defendants' assertion that Ms. Horton anticipated Ms. Jodoin might have problems with a new tablet based record system and therefore, sought a solution for Ms. Jodoin prior to the system being implemented.  However, *nothing* on page 100 of Ms. Jodoin's deposition contradicts the Defendants' statement.  Throughout my finding of Facts, I have noted numerous other instances of Ms. Jodoin's failure to accurately cite to the record.  I considered striking the Plaintiff's entire revised statement of facts and taking the Defendants' statement of facts as true.  Instead, in those instances

Horton, Ms. Jodoin, and Joe Welch, an ergonomics expert from Baystate Health's Disability Management department.  As a result of the meeting, the Practice continued using a full size monitor at the nurse's station, rather than using tablets, and a new Thin Client computer with a flat screen was purchased for the nursing station.  *Id.*, at ¶ 57.  Also discussed was the possibility of allowing Ms. Jodoin to utilize a mobile cart to roll a full size monitor to and from exam rooms. *Id.*, at ¶¶58, 105.

After Mr. Welch left the December 2005 meeting, Ms. Horton, demonstrated how Ms. Jodoin might look pushing the mobile cart, with her head turned to her null point.  *Id.*, at ¶105. *Pl's Rev. Facts,* at ¶25.  Ms. Jodoin was embarrassed and humiliated by Ms. Horton's actions. *Id.*, at ¶5.[2]

At some point, prior to Ms. Jodoin requesting any accommodations, Judy Baird, from Baystate Health Information Services Department, attempted to alter the font on the records-keeping system so Ms. Jodoin could read it more clearly.  *Defs' Facts,* at ¶59.  Ms Baird had little success due to the parameters that the system designer had set for the program.  *Id.*

In the winter of 2005 and Spring of 2006, Ms. Jodoin and Ms. Horton attended two group training sessions.  The 2005 training session was  a vendor's training session demonstrating how

---

where Plaintiff has disputed/asserted facts without proper or accurate citation to the record, I have accepted the Defendants' facts as true.  Furthermore, while I have pointed out *many* instances in which Plaintiff disputes Defendants' asserted facts without proper citation to the record-- rather than waste further judicial resources, I have, on occasion, simply adopted the Defendants' statement(s). Where Plaintiff disputed a fact with proper record support, I have adopted Plaintiff's version of the asserted fact(s).

Plaintiff's counsel should bear in mind that there is a fine line between stating the facts in a light most favorable to your case, and misrepresenting the facts.  At this time, I am considering whether to order Plaintiff's counsel to appear for a show cause hearing to determine whether sanctions are appropriate.

[2] It should be noted that while in her affidavit Ms. Jodoin claims to have been embarrassed and humiliated, in her deposition testimony she acknowledges she may have laughed and it is undisputed that at the time, she gave no indication she found Ms. Horton's conduct offensive.  While Ms. Jodoin seemingly re-characterizes this episode, because her affidavit testimony does not completely contradict her deposition testimony, I have allowed it to stand.

to order supplies.  Everyone was in chairs sitting around Ms. Jodoin, who need to go slow because of the computer.  *Defs' Facts,* at ¶106.  Ms. Horton began pointing to where items were on the screen prompting Ms. Jodoin to get out of her seat. [3, 4].

In the Spring 2006 training session, Ms. Jodoin was using the computer as part of the group training.  The vendor was showing Ms. Jodoin how to operate the system when Ms. Horton became impatient with Ms. Jodoin.  Ms. Horton belittled Ms. Jodoin in front of staff and the sales representative, saying, for example,  "Look over here. Hurry up! Why can't you do it?"  Eventually, Ms. Horton told Ms. Jodoin to let her do it and told her to get out of her chair.  *Pl's Rev. Facts,* at *Ex. 4* (Aff. Of Elaine Miner In Sup. Of Pl's Opp. To Defs' Mot. For Sum. J), at ¶4; *Defs' Facts*, at ¶108.  Ms. Horton later apologized to Ms. Jodoin privately in the hallway.  *Defs' Facts*, at ¶108.[5]

**Facts Related to Count I, Violations of the ADA and Count II, Violations of Chapter 151B**

---

[3] Ms. Jodoin denies all allegations in *Defs' Facts,* ¶106, despite the fact that, with the exception of the first two sentences, the facts stated are taken directly from her deposition testimony.   If Ms. Jodoin meant only to deny those first two sentences, she should have so specified.

[4] Defendants have also cited to portions of the record which do not support asserted facts– albeit to a far lesser extent than the Plaintiff.  For example, citing to Ms. Jodoin's deposition, Defendants assert: "Horton, Plaintiff acknowledges, did *not* yell or speak to her derogatorily".  *Defs. Facts,* at ¶107.  In support of this assertion, Defendants cite to page 341 of Ms. Jodoin's deposition.  However, nothing on this page supports this asserted fact; on the contrary, Ms. Jodoin states that Ms. Horton was directing her to do things "Not in a pleasant way".  *Defs' Facts*, at App. Pt. 16 (excerpts of Ms. Jodoin's depostion), at p. 341, App. p. 278.

[5] Ms. Jodoin inexplicably denies that Ms. Horton apologized to her, despite the fact that she admits the same in her deposition, and, essentially, admits the same in *Pl's Rev. Facts,* at *Disp. Facts* ¶107. Ms. Jodoin also denies Defendants assertion that she was subsequently provided with additional personal training by the vendor with Ms. Horton's approval, despite the fact that Defendants accurately cited her own deposition testimony as support for this fact.  *See Defs' Facts, at App. Pt. 16* (excerpts of Ms. Jodoin's Deposition*), at p. 344, App. 279. Additionally, while it is a minor point , Ms. Jodoin states that this was not a group training session, despite her own deposition testimony (on multiple occasions) to the contrary and Ms. Minor's characterization as it being group training session in her affidavit.  More troublesome, is the fact that there is no support for Ms. Jodoin's assertion that the trainer was unable to complete her training "because of Defendant Horton's harsh interruptions".  *See Pl's Rev. Facts*, at *Disp. Facts*  ¶108 and *Defs' Facts, at App. Pt. 16 (*excerpts of Ms. Jodoin's Deposition*), at p. 344, App. 279.

Ms. Jodoin's vision was relatively stable, with only minor changes through September 2006. *Defs' Facts*, at ¶40. Thereafter, Ms. Jodoin began suffering significant deterioration in her vision; there has never been a specific diagnosis as to what caused the deterioration. *Id.* At this time, Ms. Jodoin was having increased difficulty seeing the monitor when using the electronic medical records system. *Pl's Rev. Facts*, *Undisp. Facts* at ¶7.

In October of 2006, Ms. Jodoin made an informal verbal request to Ms. Horton for a larger monitor. The request was accompanied by a note from her ophthalmologist indicating that "[s]he would benefit from using a larger monitor at work." *Defs' Facts,* at ¶33; *Pl's Rev. Facts*, *Undisp. Facts* at ¶7. Ms. Jodoin's opthalmologist did not specify what size monitor would best assist Ms. Jodoin. The Practice has 19" monitors available, but it was not clear whether these monitors would be sufficient to meet Ms. Jodoin's needs. Ms. Horton, Judy Baird, and Joe Welch, from the Practices' Disability Management, began to explore what assistance could be provided to Ms. Jodoin. *Defs' Facts, at ¶60 and Ex. 2*, at App. 32- 37.

About a week after Ms. Jodoin's first verbal request, she and Ms. Horton had a lunch-time conversation in the break room about the status of the new monitor. *Pl's Rev. Facts,* at *Undisp. Facts* ¶12.[6] This conversation upset Ms. Jodoin and she spoke directly to the Human

---

[6] Ms. Jodoin asserts in her affidavit that Ms. Horton made a comment that since Ms. Jodoin was hired with a disability the Practice did not have to accommodate her and further, that the Practice was looking into whether it would be cheaper to hire and train someone else rather than accommodate her. *Pl's Rev. Facts,* at *Undisp. Facts* ¶14; *Pl's Facts*, at *Ex. 1* (Jodoin Aff.), at ¶6. Ms. Jodoin then asserts that later that day, she asked Ms. Rodriguez what she remembered about the conversation and that Ms. Rodriguez confirmed Ms. Horton's comments. Ms. Jodoin goes on to state that "Ms. Rodriguez also documented the conversation by sending an e-mail to Ms. Jodoin relaying exactly what she heard." *Pl's Rev. Facts*, at *Undisp. Facts* ¶ 15. However, a review of the e-mail shows that Ms. Jodoin actually initiated the e-mail and it was Ms. Jodoin who related what was said by Ms. Horton during the conversation. Ms. Rodriguez then replied to the e-mail stating that she was present during the conversation and it did occur. While it may be a minor point, given that Ms. Jodoin in her statement of facts once again chose to mis-characterize the record, I am not accepting the asserted factual statements.

Resources Coordinator about it.  *Defs' Facts*, at ¶113.  No actions were taken following Ms.

Jodoin's discussion with Human Resources.  *Id.*

     In the fall of 2006, Ms. Jodoin, Ms. Horton, Mr. Welch, and Ms. Baird met to discuss

Ms. Jodoin's request in greater detail.  *Id.* at ¶61.[7]   Ms. Jodoin was encouraged to test the

"larger" standard monitors that the Practice had readily available as well as other larger

monitors.  Various vendors were invited to the Practice and met with Ms. Jodoin to learn about

her restrictions and to make recommendations regarding equipment which might be available to

assist her.  *Defs' Facts*, ¶61.  Ms. Jodoin visited another Baystate Health site to examine a

different size monitor, but was unable to sign in to see if it would work.  *Pl's Rev. Facts*, at *Disp.*

*Facts* ¶63.[8]  Ms. Jodoin ultimately indicated that 19" and 20" monitors would not sufficient.

*Defs' Facts*, at ¶63.

     Ms. Baird contacted Dell to inquire about the cost of a 21" monitor. *Defs' Facts*, at ¶65

and *Ex. 2*,  at App. 40.  She learned that Dell did not manufacture 21" monitors and that existing

mobile carts were not equipped to transport monitors of that size.  *Id.*

     On or about December 14, 2006, Ms. Jodoin filed a formal request for a reasonable

accommodation.  Ms. Horton assisted in the filing of the request by filling out a portion of the

---

[7]  Ms. Jodoin denies *Defs' Facts*, ¶61, stating that the meetings occurred "after Thanksgiving 2006, after the second verbal request but before the formal written request".  *Pl's Rev. Facts*, at *Disp. Facts* ¶ 61. First, since Defendants' statement is that the meetings were held before the formal request, it is unclear what Plaintiff is purporting to dispute.  Second, the deposition testimony she cites actually supports the Defendants' asserted fact; it is clear that Ms. Jodoin is unclear about the exact date of the meetings, but she explicitly states in the cited testimony that they occurred after the first verbal request, but before the formal written request. *Defs' Facts*, *Ex. (Excerpts of Jodoin Dep)*, at pp. 169-170, App., 209-210 .

[8]  Once again, Plaintiff inexplicably felt it necessary to embellish a factual statement without record support. Ms. Jodoin states that other than this one site, "[t]here was no other site visit mentioned or suggested." *Pl's Rev. Facts*, at *Disp. Facts* ¶63.  However, the deposition page cited in support of this statement does not support this assertion.

document relating to what steps the Practice had already taken.[9]  Ms. Blaney, a Senior Employee Relations Consultant at Baystate Health, contacted Joe Welch, who indicated, with one exception (a headset), the issues raised in the request were already being reviewed and discussed. *Id.*, at ¶68.  Among the accommodations sought in the December 14, 2006 formal written request was "adequate lighting" for Ms. Jodoin's workspace.  *Pl's Facts*, at *Ex. 5.*

On December 18, 2006, Ms. Baird followed up with a vender via email to check on a quote for equipment that had been discussed for Ms. Jodoin.  *Defs' Facts,* at ¶70.  The vendor responded the next day and apologized for the delay.  Ms. Baird did not receive a quote so she sent another follow-up e-mail, on January 30, 2007, indicating that no response had been received and again explaining the options as to which Baystate Health wanted to receive more information. *Id.*

The necessity for monitors larger than 20" raised additional issues which needed to be addressed.  For example, the six exam rooms did not have room for larger monitors on the table space and therefore, it had to be determined whether it was feasible to attach the monitors to the wall with a mechanical device.  Also under consideration was the possibility of procuring one oversized monitor that could be attached to a mobile cart, which could be moved from exam room to exam room.  *Id., at ¶66.*  Various carts were tested, however, there were concerns about existing carts being suitable for such large monitors; the carts available were designed to handle 20" monitors and there was a concern they would tip over using a larger monitor. *Id.*

---

[9] Ms. Jodoin denies this statement, stating that she found the formal accommodation request form on the Practice's intranet and completed it herself.  *Pl's Rev. Facts*, at *Disp. Facts* ¶68.  However, the deposition testimony cited by Ms. Jodoin (pages 118-19 of her deposition) refers to her having found the policy about making informal verbal requests on the Practice's intranet; the filing of her formal written request for reasonable accommodation is not mentioned in the cited testimony. *See Defs' Facts*, App. 11 (*Excerpts of Jodoin Dep.*), at pp. 118-19; App. 189-190.

Ms. Baird was aware that a second generation of carts was coming out in the Spring that presumably would work with larger monitors.  By February 2007, the Practice had began the evaluation process for the second generation of carts, which involved clinical input, technical input, infection control, ergonomic input and clinical engineering.  *Id.,* at ¶67.  Ms. Baird explained the capabilities of the second generation carts and Ms. Jodoin went with her to an in-service relating to the second generation of carts, one of which was purchased for Ms. Jodoin. *Id.* On April 9, 2007, Baystate Health ordered a 21" monitor to be used with the cart. *Id.*, at ¶ 81.

In the fall of 2006, Elaine Miner, a medical assistant at the Practice, noticed that Dr. Ahmed began skipping over Ms. Jodoin and worked more directly with Alex Jones, a medical assistant in the Practice.  *Pl's Rev. Facts*, *Undisp. Facts* at ¶27. [10]*Deposition Testimony of Elaine Miner* ("*Elaine Dep.*"), at ¶6. [11]

---

[10] Actually, Ms. Jodoin asserts that "In the fall of 2006, the practice's lead physician, Dr. Ahmed, *and Defendant Horton*, began assigning many of Ms. Jodoin's responsibilities to other employees, namely Alex Jones a medical assistant." *Pl's Rev. Facts*, at *Undisp. Facts* ¶27 (emphasis added). In support, of this asserted fact, Ms. Jodoin cites to paragraph 7 of the affidavit of Elaine Miner. *Pl's Facts*, at *Ex. 4* (Aff. Of Elaine Miner In Sup. Of Pl's Opp. To Defs' Mot. For Sum. J.).  First, I have stricken paragraph 7 of Ms. Miner's deposition and therefore, have revised Plaintiff's asserted facts to comport with paragraph 6 of Ms. Miner's affidavit, which I have allowed to stand.  Second, neither in paragraph 6 nor paragraph 7 (which Ms. Jodoin cited) does it state that *Ms. Horton* began to assign any of Ms. Jodoin's responsibilities to Ms. Jones or anyone else.

[11] In her Amended Complaint, Ms. Jodoin asserts, as example of retaliation, that Ms. Horton suggested she was fabricating the issue of whether an LPN new to the practice had made serious errors.  Ms. Jodoin's deposition testimony directly contradicts this assertion.  Nevertheless, in her disputed facts, Ms. Jodoin attempts to revive the allegation by citing to ambiguous deposition testimony and asserts that "Defendant Horton specifically went against Plaintiff's recommendations and gave the LPN a raise despite mistakes that could have adversely affected patients". *Pl's Rev. Facts*, at *Disp. Facts* ¶99.  Ms. Jodoin makes this assertion despite the fact that elsewhere in her deposition testimony she *unequivocally* makes clear that Ms. Horton did not go against her recommendation in giving the LPN a raise, rather Ms. Horton accepted her recommendation to extend the LPN's probation. *Defs' Facts*, *Excerpts of Jodoin Dep*, at pp. 421,427; App. 303, 305; *Pl's Rev. Facts*, *Ex. 14 (Excerpts of Jodoin Dep.),* at p. 439. I find that there is no disputed issue of fact concerning whether Ms. Horton undermined Ms. Jodoin concerning to this matter. Therefore, I am disregarding the factual assertion and will not consider it as support for any of Ms. Jodoin's claims.

Also in the fall of 2006, a vendor visiting the site had loaned Ms. Jodoin a trial swing arm that enabled Ms. Jodoin to bring her computer monitor closer to her face.  *Defs' Facts,* at ¶75. For some reason, the loaner swing arm did not properly hold the monitor and Ms. Jodoin used a soda can to hold up the monitor.  *Pl's Rev. Facts,* at *Disp. Facts* ¶75.

When the trial swing arm was attached, Ms. Jodoin indicated that she did not have sufficient room on her desk to do paperwork.  *Defs' Facts*, at ¶76.   In February of 2007, Ms. Horton completed a work order to modify Ms. Jodoin's desk to allow her additional workspace. *Id.*  Ms. Jodoin was not satisfied with the adjustments to her workspace, so Baystate Health had its carpenter build Ms. Jodoin a custom made desk.  Although the measurements for the desk were taken before Ms. Jodoin commenced leave under the FMLA, the desk did not arrive until after she was out on FMLA leave.  *Id.*, at ¶77.  In February, 2007, Ms Horton placed a work order for the purchase and installation of under counter lighting at the nurse's station. *Id.*, at ¶78.

Ms. Horton, shortly after returning from vacation on January 25, 2007, e-mailed Ms. Baird to inquire about the status of the monitors and to inquire as to whether any decision had been made regarding the size of the monitor.  *Id.* at ¶71. On or about February 20, 2007, two 21" monitors were ordered, one for Ms. Jodoin's office and one for the front desk. *Id.*, at ¶74.   Ms. Jodoin was informed that the two monitors had been ordered.  *Id.*   A new swing arm was ordered on February 22, 2007 and arrived in April 2007. *Defs' Facts*, at ¶75.

In January 2007, Ms. Jodoin retained an attorney and asked him to send Ms. Horton a letter addressing Baystate Health and Ms. Horton's failure to provide Ms. Jodoin with a reasonable accommodation.  *Pl's Rev. Facts,* at *Undisp. Fact* ¶16.  The letter, which Baystate Health received in February 2007, asserted that Baystate Health had not taken any action

14

regarding Ms. Jodoin's requests for accommodation.  *Defs' Facts*, at ¶88.  Counsel for the

Defendants replied immediately, noting that Ms. Jodoin was considered a valued employee and

affirmed their commitment to making all reasonable accommodations.  The response noted that

there had been on-going meetings with experts and that Baystate Health had been working with

the Plaintiff to explore suitable options, that no request had been rejected and that they were

seeking cost estimates and examining the feasibility of certain equipment changes.  *Id.* at ¶89.

After receiving the letter from Ms. Jodoin's attorney, Ms. Horton sought guidance from Human

Resources who instructed her that Ms. Jodoin should continue to be treated the same as she

always had.  *Id.*, at ¶90.

During this time (February of 2007), Ms. Baird, of Information Services, exchanged e-

mails with Baystate Health's vendor to determine if it could modify the font and resolution of the

electronic medical records system.  *Id.* at ¶82.  The vendor indicated that the system was

designed to operate at a particular resolution; that it was operating as designed; and that

changing it to a different size could effect the way in which the program would have to be used.

*Id.*  Baystate Health then put in a request to the vendor to see if any enhancement could be

developed that would allow a change in the resolution without effecting  how the program was

used. *Id.*  In April, Ms. Baird learned from Baystate Health's vendor that it was unlikely that it

could make any immediate changes to suit Ms. Jodoin's needs.  *Id.,* at ¶83 .

A major snowstorm was predicted to hit Western Massachusetts on February 14, 2007.

*Defs' Facts,* at ¶92.  Ms. Jodoin submitted a form that stated "if it is snowing heavy or freezing

rain I may have to be out or possibly late- I'll call".  An LPN had previously requested the day

off and, therefore, if Ms. Jodoin did not come in, Ms. Horton was going to have to arrange for

15

clinical coverage. *Id. R*ather than take a chance that there would not be coverage, Ms. Horton marked Ms. Jodoin as "out" and told her to take the day off; Ms. Horton was going to arrange for coverage. *Id.* Because the snowstorm was so bad, the Practice was closed.  Despite being marked out, Ms. Jodoin was paid for that day. *Id.* [12]

Baystate Health held a meeting on February 22, 2007, to discuss the status of all outstanding concerns in regards to Ms. Jodoin's request for reasonable accommodation.  *Defs' Facts*, at ¶93.  The day after the meeting, Ms. Jodoin sent Ms. Blaney an e-mail expressing her appreciation for taking the time to discuss her disability and the necessary accommodations.  The e-mail confirmed that Ms. Horton had expressed to Ms. Jodoin that she was a valued employee and that Baystate Health was working on the accommodations.  The e-mail also confirmed that Ms. Horton had informed Ms. Jodoin that two 21" monitors had been ordered and Baystate Health was awaiting delivery.  During the meeting, it was also confirmed that the mobile carts that had been seen to that point were unsatisfactory and Ms. Horton had indicated that a work order had been placed to modify her work area.  Also at the meeting, Ms. Jodoin confirmed that she was aware that Baystate Health had placed two work orders with the vendor for Baystate Health's electronic record system to try to resolve the font issue with the software program.  Ms. Jodoin concluded her e-mail by thanking Ms. Blaney for all the efforts which were being made on her behalf.  *Id.*

The attempts to resolve Ms. Jodoin's problem with monitors by increasing the font size was unsuccessful because with the font size enlarged, Ms. Jodoin lost a portion of the field in which she was supposed to be working, which could cause her to miss things (in terms of

_____

[12] Ms. Jodoin disputes the Defendants' version of the facts, however, the pages to her deposition which she cites in support of her version were not included in the record.

inputting information into the system).  *Id.*, at ¶85.  In February 2007, after getting this feedback from Ms. Jodoin, Mr. Welch e-mailed three physicians he knew to see if they had any suggestions regarding different magnification software.  *Id.* [13]  Mr. Welch was investigating the possibility of utilizing magnification software because it had already been determined that increasing the font size and resolution on the electronics record program necessarily resulted in the problems referred to by Ms. Jodoin.  Mr. Welch also sought and obtained guidance and recommendations from individuals and organizations knowledgeable about screen magnification.  Individuals associated with Boston's New England Eye Center suggested that magnification may fix one problem, but create others.  Therefore, they suggested that Ms. Jodoin be examined by a doctor affiliated with them.  Ms. Jodoin was not receptive to the possibility. *Id.,* at ¶86.[14]

   The two monitors arrived in March 2007. *Id.*, at ¶ 79.  One was placed in Ms. Jodoin's office.  The second monitor was to be placed in the front desk area; Ms. Horton submitted a work order fo the modification of this area so that it could accommodate a 21" flat screen monitor.  *Id.*   Approximately six weeks after the February meeting, Ms. Horton brought in a lamp for Ms. Jodoin to use at her desk.  *Pl's Rev. Facts*, *Undisp. Facts,* at ¶23.

---

[13] Ms. Jodoin not only inexplicably disputes this factual assertion, she has egregiously distorted the record evidence in doing so.  *See Pl's Rev. Facts*, at *Disp. Fact* ¶85.  First, she accuses Mr. Welch of sharing her private medical information. *Id.*  In point of fact, Mr. Welch did not share her private medical information, he simply referred to an unnamed RN who had specific medical conditions which Baystate Health was trying to accommodate. *See Defs' Facts*, at *Ex. 29.*  Second, Ms. Jodoin asserts that Mr. Welch did not just ask for suggestions about different types of software, he also asked for a medical opinion on whether screen magnification would be appropriate for her medical condition (which she apparently feels would have been inappropriate since *she* had already informed Baystate Health that she needed larger font sizes). *Pl's Rev. Facts*, at *Disp. Fact* ¶85.  He did not, rather Mr. Welch was trying to determine whether purchasing magnification software would be helpful and he simply asked the three doctors if the manufacturers' claims were true and whether they could recommend any other magnification software. *Defs' Facts*, at ¶85.

[14] Ms. Jodoin again disputes a fact as to which Defendants have provided record support.  In doing so, she ignores her own deposition testimony which unambiguously supports the Defendants' assertion and instead, cites to deposition testimony which is referring to a separate event from an earlier time period.

In the spring of 2007, Baystate Health procured a trial version of ZoomText 9.0 magnification software and installed it on Ms. Jodoin's computer.  It did not work well. *Defs. Facts*, at ¶87.  Ms. Jodoin went out on leave before any additional fixes could be attempted.  *Id.*

On April 3, 2007, Ms. Horton criticized Ms. Jodoin for returning late from her lunch break, but did not speak with another employee who was with Ms. Jodoin at the time.  *Id.* at 33.  No disciplinary action against either Ms. Jodoin or the other employee was taken.  *Id.*

Evaluations of Ms. Jodoin, performed by Ms. Horton after her requests for reasonable accommodation, continued to rate her as exemplary and she continued to receive wage increases throughout the period during which accommodations were being explored.  *Id.*, at ¶¶96,97.

Two employees, including Ms. Horton's manager, Connie Despres, complained of Ms. Jodoin's use of all capital letters in her e-mails, given that, generally, the use of capital letters in an e-mail is a sign of anger.  *Id.,* at ¶110.  Ms Jodoin explained to each that she needed to do so because of her nystagmus and vision.  *Id.*  Ms. Despres promptly replied to Ms. Jodoin thanking her and indicating that she had not been aware.  *Id.*  Ms. Horton showed Ms. Jodoin how to type in all capitals and change the font before sending her e-mails.  *Id., at ¶ 109.*  Ms. Jodoin elected to continue to use all capitals.  *Id.* While Ms. Jodoin felt that Ms. Despres continued to be unhappy with her use of capital letters, *Pl's Rev. Facts*, at *Disp. Fact* ¶110, she was not directed to change the font before sending out e-mails, nor did anyone ever complain to her after this incident. *Id.*, at *Disp. Facts* ¶109; *Defs' Facts*, (Excerpts of Jodoin Dep.), at App. 282-83.

Ms. Jodoin left work on May 14, 2007 and went to the emergency room.  The emergency room physician told her not to return to work the next day and to schedule an appointment with

her primary care physician.  Her primary physician instructed her not to return to work until he could see her.  *Defs' Facts.,* at ¶115.

In July of 2007, every employee at the Practice received a new computer.  *Id.,* at ¶98. The day before the new hard drives were installed, Ms. Horton reminded everyone to back up any data which they had saved on their local hard drives.  *Id.*  Ms. Jodoin was out on FMLA leave at the time and was not contacted about the change to the computers. Ms. Horton didn't think to contact Ms. Jodoin and she believed that Ms. Jodoin kept everything on the "internet". Information saved on Ms. Jodoin's hard drive was not backed up and, as a result, she lost information on the study aids that one of the Practice physicians used to study for his boards. *Id.*[15]

### *Facts Related To Ms. Jodoin's FMLA Claim*

Baystate Health was and is an employer covered by FMLA.  Baystate Health's Disability Management Services ("Baystate DMS") makes all determinations as to whether an employee is eligible for leave under the FMLA.  All medical certifications relating to the leave are handled by Baystate DMS.  The only role a manager plays in the process is confirming that the employee has worked for Baystate Health long enough and worked sufficient hours during the prior year to be a covered employee under the FMLA.  Ms. Jodoin was a covered employee. *Id.*, at ¶116.

After her visit to the emergency room on May 14, 2007, Ms. Jodoin asked Ms. Horton for FMLA paperwork, which was provided to her.  *Id.,* at ¶115.   Ms. Jodoin spoke with an unidentified nurse in Baystate DMS in May 2007.  The nurse told Ms. Jodoin that her FMLA

---

[15] Ms. Jodoin asserts that she lost valuable personal and patient data, but does not know if she lost any personal data in the drive update and can only remember losing the information that a Practice physician used to study for his boards.  *See Jodoin Dep*. at 445-446.

leave request was denied because hypertension was not considered a serious health condition under the FMLA.  After doing her own research on-line and contacting a government hotline, Ms. Jodoin called the unidentified nurse back and told her that she qualified for leave under the FMLA.  *Pl's Rev. Facts*, at *Disp. Facts* ¶117.  Ms. Jodoin never received any written documentation indicating that any request for FMLA leave was denied.  *Defs' Facts*, at ¶117.  In any event, on May 24, 2007, Baystate DMS sent Ms. Jodoin notification that her FMLA leave was provisionally granted, but that paperwork was missing, including a certification from her health care provider. *Id.*.

Thereafter, Ms. Jodoin submitted a note from her treating physician, Dr. Ballan, indicating that he had seen her on May 23, 2007; she was diagnosed with a "medical illness." *Id.,* at ¶118.  The note further indicated that she had been out of work since May 14, 2007 and her return to work date was unknown; she was scheduled to be re-examined on June 18, 2007. *Id.*  Ms. Jodoin's FMLA leave was again provisionally approved, from May 14- June 20, 2007. Additional information was again requested to ascertain if she had a serious health condition under the FMLA.

The processing of Ms. Jodoin's claim was made difficult because the information which Baystate DMS received from various health care providers showed different justifications for her absence.  After receiving Dr. Ballan's certification that Ms. Jodoin suffered from a "medical illness," additional information was sought and Baystate DMS was informed that Ms. Jodoin was suffering from work related hypertension and depression.  Thereafter, Baystate DMS was informed that Ms. Jodoin was suffering from a severe loss of vision.  *Id.*, at ¶122.  Ultimately, Ms. Jodoin received a full twelve weeks of FMLA leave.  *Id.*, at ¶119.  However, Ms. Jodoin did

20

not receive full benefits under the FMLA until congenital nystagmus was listed as the medical reason she was seeking leave. *Pl's Rev. Facts,* at *Disp. Facts* ¶122.[16]

All medical information in support of leave under the FMLA relating to an employee's serious health condition is sent directly to, and reviewed by, Baystate DMS and not shared with managers.  Managers are simply informed that the employee has been approved for FMLA leave and the nature of the leave, either consecutive or interim.  *Defs' Facts.,* at ¶120.[17]

On August 2, 2007, Ms. Jodoin told Anna Waite, a Baystate DMS employee, that she did not anticipate returning to work any time soon because her vision had deteriorated to the point where she could no longer drive and she planned to apply for long term disability benefits.  *Ids.,* at ¶123.[18]

---

[16] While I have stated this fact in Ms. Jodoin's favor, I am concerned that the only support for it is Ms. Jodoin's own statement made in her affidavit.  Ms. Jodoin claims that she gave Baystate DMS certification that her illness was hypertension and job stress, but does not provide the Court with any copies of any such documentation.  Nor has she cited to any evidence which would support her contention that Baystate DMS forced her to change the justification to congenital nystagmus.  Her failure to cite to any such record evidence is particularly troublesome given that the medical documentation in the record suggests that she began experiencing significant vision problems as early as the fall of 2006.

[17] Ms. Jodoin disputes this asserted fact, citing to paragraphs 7-8 of the Affidavit of Gary Mackey, In Sup. Of Defs'Mot. For Sum. J.  *See Defs' Facts*, at App. 2.  In doing so, Ms. Jodoin misreads the substance of Gary Mackey's testimony which states only that when the expiration of the employee's FMLA leave is approaching and it appears the employee will not be able to return to work, Baystate DMS will confer with the manager to determine whether, for operation reasons, the employee's position will need to be filled, or the position can be held open.  If the employee cannot return, a notice is prepared for the manager's signature informing the employee that s/he is being put on displaced status.  *Id.*

[18] Ms. Jodoin inexplicably denies Defendants' assertion of this fact on the grounds that the Defendants' cited support is inadmissable hearsay and not based on personal knowledge.  However, Ms. Jodoin did not seek to strike any portion of Gary Mackey's affidavit, on which Defendants rely.  Furthermore, Defendants essentially repeat the same asserted fact in paragraphs 16 and 125 of their statement of undisputed facts (Defendants reference to August 2, 2008 in paragraph 125 is clearly inadvertent). *See Defs' Facts*, at ¶¶ 16 and 125.  In her response to the Defendants' statement of undisputed facts, Ms. Jodoin's answer to both paragraphs 16 and 125 is "Admitted." *Pl's Rev. Facts*, at *Disp. Facts*, ¶¶16,125.  Finally, in support of ¶125, Defendants cite to Ms. Jodoin's own deposition testimony in which she admits the conversation took place.

Before July 2007, when Ms. Jodoin was already on FMLA leave, she had not informed the Defendants that her eyesight was deteriorating. *Id.* at ¶13.  By August 8, 2007, Ms. Jodoin's eyesight had worsened precipitously.  *Id.,* at ¶12.  She had lost her driver's license and her medical provider had completed a Mandatory Report of Legal Blindness with the Commission for the Blind.  *Id.*

Under Baystate Health's normal practice, if an employee is unable to return to work at the end of a twelve week FMLA leave, the are generally placed in "displaced" status, rather than terminated or laid off.  *Id.*, at ¶7.  If the employee cannot return after the twelve week period, but it is anticipated that the individual is likely to return in the near future, job protection for the employee's position is extended.  However, if after the twelve weeks the employee cannot return to work, no return to work in the near future is foreseen and a manager needs to fill the position for operational reasons, the individual is placed in displaced status and the manager can proceed to fill the position.  *Id.*, at ¶9.

On August 8, 2007, Ms. Jodoin's health care provider, Dr. C. Toomey, checked "no" when asked if Plaintiff "was able to perform the essential functions of the employee's job? (based on job description or discussion with employee.)". *Id.*, at ¶17.[19]   After Ms. Jodoin provided Dr. Toomey's certification to Baystate DMS, it was determined that Ms. Jodoin would

---

[19] Ms. Jodoin disputes this fact on the grounds that "Without a job description, Dr. Toomey was required to check "no," and *intended to fill a new form when a job description was forwarded to her*". *Pl's Rev. Facts*, at *Disp. Facts* ¶17 (emphasis added).  However, Dr. Toomey checked off the "no" box without further explanation; elsewhere on the form, when Dr. Toomey felt it necessary to elaborate, she did so by making a handwritten notation. Ms. Jodoin fails to offer a rationale explanation as to why the Defendants erred in relying on Dr. Toomey's certification that she could not perform the essential functions of her job, or how they were supposed to glean Dr. Toomey's intent-- if that was her intent as I will also point out that nowhere in the deposition testimony cited by Ms. Jodoin in support of her position does it state that Dr. Toomey intended to file a revised certification when a job description was provided to her. Rather, Ms. Jodoin simply states that she intended to get back to Dr. Toomey with a more detailed job description of the essential functions of her job. There is simply no basis for Ms. Jodoin to dispute the asserted fact.

be unable to return from her FMLA leave at that time.  Baystate DMS informed Ms. Horton that Ms. Jodoin was not likely to return to work in the near future, if ever. *Id.*, at ¶20.  Ms. Horton determined that it was necessary to fill Ms. Jodoin's position and, therefore,  Ms. Jodoin was placed on "displaced status" as a Baystate Health employee.  *Id.*,  at ¶20.  Baystate DMS, as per customary procedures, prepared the displacement letter using a standard template, for execution by the manager.  *Id.*

On August 10, 2007, Ms. Jodoin was sent a notice that she was being placed on displaced status because she was unable to return from her FMLA leave.  *Id.*, at ¶21.  The notice informed Ms. Jodoin that her position would no longer be kept open, that she remained an employee of Baystate Health and that if she becomes medically cleared to return to work, she would be assigned a recruiter from the recruitment office to help her find a new position within the organization.  *Id.*

 Managers are permitted to fill the position of displaced employees in order to meet work product requirements.  *Id.*  As a displaced employee, Ms. Jodoin was eligible for an additional forty weeks of extended medical leave (bringing total leave availability up to fifty-two weeks) and remain covered by Baystate Health's insurance program.  *Id.,* at ¶11.  If a displaced employee is able to return to work and his or her former position has been filled, that employee can apply for vacancies anywhere within the Baystate Health system and can do so as an internal candidate.  *Id.*  Internal candidates are given preference over any external candidates.  *Id.*  If, after fifty-two weeks of extended leave, a displaced employee cannot return to work the employee is terminated.  *Id., at ¶*11.  On May 15, 2008, a letter was sent to Ms. Jodoin informing her that since she was still unable to return to her position, with or without reasonable

23

accommodation, her status was being changed from "Leave of Absence" to Administrative Termination". *Id.*, at ¶25.

*Facts Related To Ms. Jodoin's ERISA Claim*

After expiration of FMLA leave an employee who is unable to return to work may be entitled to long-term disability ("LTD") benefits.   By practice, if an employee is out on FMLA leave for their own serious health condition and if it appears that the employee may not be able to return at the end of the FMLA leave, Baystate Health will generally forward an LTD application to the employee. *Id.*, at ¶124.  The employee cannot receive LTD benefits without having filed an application and providing sufficient medical documentation establishing that their eligibility for the same. *Id.*

Baystate Health provides the Group LTD Plan to full-time employees at no cost to the employees. *Id.*, at ¶127.  The LTD Plan pays fifty percent (50%) of wage replacement for those eligible (Option 1). During open periods, employees may elect to increase the benefit to sixty percent (60%)(Option 2) or seventy percent (70%)(Option 3), in return for contributions taken as pre-tax deductions from the employees' wages. *Id.*  Ms. Jodoin received a summary description of the LTD Plan and distributed them to others.  However, she did not read the document. *Id.*, at ¶128.

Prior to the fall of 2006, Ms. Jodoin was enrolled in Option 1 of the Plan, that is she was eligible for 50% benefits. *Pl's Rev. Facts*, at *Undisp. Facts* ¶45.  During the fall 2006 open enrollment period, Ms. Jodoin elected to increase her LTD benefits to 70%, *i.e.,* Option 3, effective January 1, 2007. *Id.*; *Defs' Facts*, at ¶129.

The terms of the LTD Plan exclude coverage for disabilities caused by pre-existing conditions.  Furthermore, the LTD Plan, with certain exceptions, excludes coverage at higher levels (Option 2 or 3) when the disability caused by a pre-existing condition occurs within twelve months of an employee's election to increase coverage, *i.e.,* "buy up" to Option 2 or 3. *Defs' Facts*, at ¶135.

Specifically, the LTD Plan states:

... Such an increase will not apply to any Disability that begins during the first twelve (12) months after the Effective Date of the increase if the Disability is caused by, contributed to by, or results from a Pre-Existing Condition.  However, we will not apply this exclusion if one of the following conditions is met:

(1)  during the three (3) months just prior to the Effective Date of the increase, you did not receive medical treatment, consultation, care or services (including diagnostic measures) for the Pre-Existing Condition, and did not take prescribed drugs or medicines for the Pre-Existing Condition during that three (3) month period, and did not have symptoms for which an ordinarily prudent person would have consulted a health care provider in that three (3) month period; or

(2)  during the twelve (12) month period beginning on the Effective Date of the increase, there was a period of six (6) consecutive months during which you did not consult with a health care provider or receive care, treatment or services (including diagnostic procedures) or take prescribed drugs or medicines, for the Pre-Existing Condition, and did not during that six (6) month period have symptoms for which an ordinarily prudent person would have consulted a health care provider.

*Id.*.

The LTD Plan explains the procedure for appealing the denial of a claim.  Specifically, the LTD Plan provides:

You may request a review if all or any part of you claim is denied.  In addition, you may request a review any time you receive a notice that your benefits are being reduced or terminated for any reason.  This review will be conducted by BAYSTATE HEALTH, through a three person panel of its Appeals Board, which panel may consist in whole or in part of regular members of the Appeals Board or

of alternates designated by BAYSTATE HEALTH.  The panel of the Appeals Board designated to hear your review will have full discretionary authority to interpret the LTD Plan and to determine eligibility for benefits.

To request a review, you must notify us in writing that you are seeking a review within 180 days after receiving notice of the denial of you claim or of the termination or reduction of benefits.

*Id.,* at ¶136.  Additionally, the LTD Plan provides that legal action cannot be brought against Baystate Health thereunder until the claimant has fully exhausted his/her rights under the review procedure provided therein. *Id.*

Ms. Jodoin submitted an application for LTD benefits under Baystate Health's LTD insurance plan ("Plan").  In doing so, Ms. Jodoin filled out the employee portion of an application for LTD benefits.  *Id.*, at ¶14. [20]

In her application for LTD benefits, Ms. Jodoin indicated that she had first become unable to work on May 14, 2007, and that she had not returned to work.  She also indicated that she did not expect to return to work. *Id.*, at ¶15.  She provided Baystate DMS with a list of her health care providers. *Id.*, at ¶132.  Included was a note from Dr. Toomey stating that Ms. Jodoin was unable to return to perform the essential functions of her job.  *Id.*, at ¶17. *See* note 19 *supra.* On August 10, 2007, Ms. Jodoin received a letter from Baystate Health confirming that her application for LTD benefits had been received and she understood that the Baystate DMS was

---

[20] Ms. Jodoin asserts that she did not seek LTD benefits that in effect, Baystate Health automatically sought such benefits on her behalf.  Ms. Jodoin's testimony on this issue is contradictory.  She does testify that she understood from her Baystate DMS representative that Baystate Health would automatically start LTD benefits on her behalf so there would be no gap in coverage for her.  *Defs' Facts, Excerpts of Jodoin Dep.,* pp. 279-81, at App. 252-54.  On the other hand, she testifies that she had reviewed the policies offered by Baystate Health, *Id.*, at p. 281, 283-84, App. 254, 256-57, she completed a LTD benefits application and she acknowledges Baystate Health did not apply for the LTD benefits without her knowledge or against her will.  *Id.*, at 285, *Pl. Ex. 33*; App. 258, 409-10.

continuing to process her application for LTD benefits.  Upon receipt of the letter, Ms. Jodoin

did not inform Baystate Health that she was able to return to work *Defs' Facts,* at ¶18. [21]

Ms. Jodoin's application for LTD benefits referenced "Congenital Nystagmus, Decrease

Vision, Anxiety-Depression".  This portion of the application was completed by Ms. Jodoin.  *Id.*,

at 131. Ms. Jodoin was informed that if she were pursuing a disability claim based on depression

or emotional anxiety, she would need to present medical documentation to that effect.  Ms.

Jodoin responded that the medical documentation was family-related and did not pertain to

Baystate Health. *Id.*,at ¶133.

Per standard practice, Baystate DMS assembled Ms. Jodoin's LTD benefits application

and the supporting documents she provided.  While in some cases medical assessments can be

done by the in-house registered nurses who serve as claims analysts, in some instances a

physician is consulted.  Baystate DMS refers such matters to a Dr. James Garb, who had served

as Director of Occupation Health before retiring to the Cape.  Dr. Garb provides consultation

services to hospitals and insurance companies.  *Id.*, at ¶137.

On October 9, 2007, two letters were sent to Ms. Jodoin by Kate Barkman, a claims

analyst.  The first confirmed that Ms. Jodoin's documentation supported the fact that she was

disabled and approved her LTD claim, with the standard 50% wage replacement benefits,

effective August 13, 2007, ninety days after the commencement of her leave. *Id.,* at ¶138.  A

second letter, issued that same day, noted that there was a need to "investigate whether your

---

[21] Ms. Jodoin denies this fact by asserting that "she did not understand the nuances of the LTD request",
and  was still discussing the temporary nature of the training which would allow her to return to work. *See Pl's Rev.
Facts,* at *Disp. facts* ¶18.  However, the deposition testimony she cites (pp. 308-10) does not support her contention
that she did not understand the request.  Furthermore, the deposition testimony she cites makes clear that she was not
ready to return to work at that time.

present condition was caused or contributed to by a pre-existing condition" and that "[u]nfortunately, based on [sic.] our review, you claim must be denied at the 70% LTD benefit level". *Id.*, at ¶139.  The determination letter then reviewed the definitions of pre-existing condition and noted that the disability commenced within 12 months of her 70 % coverage.  Ms. Jodoin was advised of the appeals process, including the time period for filing a written request for review.  *Id.*[22]

Ms. Jodoin, who was represented by counsel during the relevant time period, did not seek review of decision to deny her LTD benefits at the 70% level until June 1, 2008, which is more than 180 days after she received noticed of the denial. *Id.*, at ¶140.[23]  Despite the fact that the appeal was late, it was submitted to the Baystate Health Long Term Disability Appeals Board ("Baystate LTD Appeals Board"), pursuant to the terms of the LTD Plan. *Id.* Because of the issues raised, an ophthalmologist was assigned to the Baystate LTD Appeals Board. *Id.*, at ¶141. On August 22, 2008, the Baystate LTD Appeals Board determined that the initial decision was correct and denied the appeal.  *Id.,* at ¶142.[24]

*Facts Related To Ms. Jodoin's Claims for Unauthorized Use Of Her Likeness and Interference With Her Privacy Rights*

---

[22] Ms. Jodoin denies the asserted fact, admitting that the letter was sent "but denies the contents which alleges she is not entitled to 70% coverage". *Pl's Rev. Facts*, at *Disp. Facts* ¶139.  Defendants' asserted fact accurately set forth the contents of the determination letter.  There was no basis for Ms. Jodoin to deny the asserted fact.

[23] Ms. Jodoin denied the asserted fact *despite actually admitting in her denial that she missed the deadline for filing her appeal*.  *Pl's Rev. Facts*, at *Disp. Fact* ¶140.  There was no basis for her to deny the asserted fact.

[24] In Ms. Jodoin's statement of undisputed facts she asserts that the only treatment she received in the first six months of 2007 was from her primary care physician for her headaches.  *Pl's Rev Facts,* at *Disp. Facts*  ¶52. However, based on the medical information in the record there remains a genuine issue of material fact concerning the number of medical visits which Ms. Jodoin had during the relevant period, as well as the medical conditions which were the subject of those visits.

28

Baystate Health sent out a mailer with a photograph of various employees of the Practice, including Ms. Jodoin concerning a change of address. *Id.,* at ¶144. The photographer explained the purpose of the picture. Ms. Jodoin willingly participated in the taking of her picture for that purpose and never asked Baystate Health not use the picture her. *Id.*, at ¶145. Ms. Jodoin never modeled for the any picture nor has she been paid for the use of her likeness. *Id.*, at ¶146. Ms. Jodoin has not identified any financial losses which she incurred as the result of the use of the photograph. *Id.,* at ¶147. Baystate Health stopped using the photograph after being served with Ms. Jodoin's complaint. *Id.*, at ¶148.[25]

A note from Dr. Kelly, date October 20, 2006, stated the visual acuity in Ms. Jodoin's eyes and indicted that her vision was secondary to congenital nystagmus. The note further stated that Ms. Jodoin would benefit from using a larger monitor at work. The purpose of the note was to support Ms. Jodoin's request for reasonable accommodation. *Id.*, at ¶149. Ms. Jodoin shared Dr. Kelly's note with Judy Baird and Joe Welch, both of whom were involved in making accommodations for Ms. Jodoin. *Id.*, at ¶150.

Ms. Jodoin did not keep the fact that she had congenital nystagmus confidential; she would discuss the matter openly so that others could learn about her condition. *Id.*, at ¶151. For example, Ms. Jodoin had told Joe Welch that she had congenital nystagmus before he saw Dr. Kelly's note. *Id.*, at ¶152.

Ms. Horton shared the information with these individuals because she believed that it was appropriate to discuss Ms. Jodoin's disability with those with whom she was working to provide

---

[25] Once again Ms. Jodoin has denied a fact as to which Defendant has cited record support and, once again, her denial contorts the factual assertion made by the Defendants. *There was no basis for Ms. Jodoin to deny the asserted fact.*

accommodations and her manager, who would need to complete requisitions for expensive equipment. *Id.*, at ¶153.

Ms. Horton allows access to her Outlook Calendar to her supervisors who may need to know her whereabouts. An entry for February 16, 2007 referenced a scheduled meeting with the notation "Disability Mtg NJ (280 Chestnut Rm 527)" *Id.*, at ¶ 154.

## Discussion

### Plaintiff's Claims for Violation of Federal and State Discrimination Laws[26]

### *Whether Baystate Health Failed To Provide Ms. Jodoin With Reasonable Accommodations*

Ms. Jodoin has asserted claims for discrimination under the ADA and Chapter 151B.  In her opposition to Defendants' motion for summary judgment, Ms. Jodoin articulates her claims as follows:  Baystate Health/and or Ms. Horton[27]: (i) discriminated against her because of her disability; (ii) violated the ADA by failing to engage in a meaningful interactive process resulting in the denial/delay of requested accommodations; (iii) violated the ADA by retaliating against her after she sought accommodations; and (iv) by creating a hostile work environment and retaliating against her and/or aiding and abetting such retaliation.

Under the ADA, an employer is prohibited from discriminating against a "qualified individual" with a disability with respect to terms, conditions and privileges of employment.  42 U.S.C. §12112(a).  Discrimination can result where the employer fails to make a "reasonable accommodation" to the known physical or mental limitations of an otherwise qualified

---

[26] It must be noted that in analyzing the Plaintiff's claims, the Court has relied on the arguments and assertions made in her memoranda, that is, the Court has analyzed the claims as presented by the Plaintiff, not the arguments and/or assertions that were otherwise available to her.

[27] Ms. Jodoin has asserted a claim against Ms. Horton under Chapter 151B, which provides for individual liability.

individual with a disability– that is where an employer fails to provide reasonable accommodations which would permit the employee to do her job . 42 U.S.C. §12112(b)(5)(A); *Tobin v. Liberty Mutual Ins. Co.*, 553 F.3d 121, 125 (1st Cir. 2009). The employer is not required to make accommodations which would create an "undue hardship." The elements for a disability discrimination claim under Chapter 151B are identical. *Miller v. Verizon Communications, Inc.*, 474 F.Supp.2d 187,194.[28]

In order to make out a *prima facie* of discrimination, the plaintiff must establish: "(1) that she was 'disabled' within the meaning of the ADA; (2) that [she was an otherwise qualified individual for her job, that is,] she was able to perform the essential functions of her job with or without accommodation; and (3) that she was discharged or adversely affected, in whole or in part, because of her disability." *Rivera v. Pfizer Pharmaceuticals, LLC,* 521 F.3d 76, 82 (1st Cir. 2008). With respect to a claim based on the employer's failure to provide reasonable accommodation, the third prong of the prima facie case can be satisfied by a showing that the employer "despite knowing of [the employee's] alleged disability, did not reasonably accommodate it." *Sensing v. Outback Steakhouse of Florida, LLC,* 575 F.3d 145, 157 (1st Cir. 2009)(citation to quoted case omitted).

A plaintiff may prove she was discriminated against because of her disability based on direct or indirect evidence. If the plaintiff establishes her *prima facie* case, the employer must

---

[28] "Chapter 151B is considered the 'Massachusetts analogue" to the ... [ADA] ... As a result, ' " ' [t]he Supreme Judicial Court of Massachusetts   [("SJC")] has indicated that federal case law construing the ADA should be followed in interpreting the Massachusetts disability law ' " '. *Sensing*, 575 F.3d at 153-54(internal citations and citation to quoted case omitted). The SJC has also adopted an analysis similar to that utilized by federal courts, *i.e.,* the now familiar burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).* Neither party has identified any material difference between application of the ADA and Chapter 151B to Ms. Jodoin's claims against Baystate Health. Therefore, this Court's analysis of Ms. Jodoin's ADA claim against Baystate Health will apply equally to her Chapter 151B claim.

articulate a legitimate non-discriminatory reason for its actions.  If the employer does so, the

burden then shifts back to the plaintiff to establish that the reasons offered by the employer were

not the true reason for its actions, but were a pretext for discrimination. *Sensing,* 575 F.3d at 155.

        To qualify as a disabled person under the ADA, the plaintiff must establish that she has

"(A) a physical or mental impairment that substantially limits one or more of the major life

activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having

such an impairment'". *Toyota Motors Manufacturing Kentucky, Inc. v. Williams,* 534 U.S. 184,

193, 122 S.Ct. 681 (2001); 42 U.S.C. §12102(2).  The Defendants do not contest that Ms. Jodoin

is a disabled person under the ADA and therefore, I will assume that she has established the first

prong of her *prima facie* case.  Furthermore, both parties presume that the second prong of Ms.

Jodoin's *prima facie* case has been met, *i.e.,* that she was a qualified individual who was able to

perform the essential functions of her job with or without reasonable accommodation.

*McDonnell-Douglas*, 411 U.S. at 802, 93 S.Ct.1817.  The parties disagree as to whether Ms.

Jodoin has satisfied the third prong of her *prima facie* case, *i.e,* whether she suffered an adverse

employment action and/or whether Baystate Health failed to reasonably accommodate her.  For

the reasons set forth below, I find that the Defendants are entitled to summary judgment with

respect to Ms. Jodoin's ADA and Chapter 151B claims.

        "To be adverse, an action must materially change the conditions of the plaintiff['s]

employ." *Gu v. Boston Police Dep't*, 312 F.3d 6, 13 (1st Cir. 2002).  Furthermore, to be adverse,

the change in employment conditions must be "more than mere trivial inconveniences." *Sensing,*

575 F.3d at 160.  The First Circuit has found that an employee who suffers a decrease in

supervisory authority and is left without a voice in major decisions could be found to have

suffered an adverse employment action. *Gu*, 312 F.3d at 14. Whether an employee has suffered an adverse employment action must be determined on a case by case basis.  Furthermore, when determining whether an employment action is "adverse," the Court applies an objective standard. *Marrero v. Goya Of Puerto Rico, Inc.*, 304 F.3d 7, 23 (1st Cir. 2002).

Ms. Jodoin asserts the following adverse employment actions by Baystate Health: (i) some of her responsibilities were taken away from her and assigned to a medical assistant; and (ii) she was subjected to a hostile work environment by her supervisor, Ms. Horton.[29] In support of her claim, Ms. Jodoin states in her memorandum that she was responsible for supervising the office and clinical staff, coordinating all patient care for the practice, and patient contact and follow-ups.  She then asserts that beginning in the fall of 2006, Dr. Ahmed began assigning many of her responsibilities other employees, primarily a medical assistant. She further asserts that transferring her responsibilities did not improve the patient care or enhance staffing levels. *Pl. Nancy Jodoin's Mem. Of Law In Sup. Of Opp. To Deft's Mot. For Sum. J.* (Docket No. 46)("*Pl's Opp.*"), at p. 4.  However, even if I assume that reassigning one or more of the specified job duties would be sufficient to materially change the conditions of her employment, Ms. Jodoin's assertion that significant responsibilities were taken from her *without specifying those job duties which were actually reassigned* is insufficient, as a matter of law, to satisfy her burden.[30]  Without specifying which of her job duties were reassigned, Ms. Jodoin has failed to establish that, viewed objectively, she suffered an adverse employment action.   *Accord*

---

[29] In her Amended Complaint, Ms. Jodoin asserts that she was constructively discharged.  She has abandoned any such claim by not providing any support argument in her memorandum.  In any event, there is *nothing* in the record to support a finding that she was constructively discharged.

[30] I will also note that while not determinative, it is informative that during the entire period from the fall of 2006 until she went out on FMLA leave, Ms. Jodoin continued to receive exemplary reviews and salary increases and maintained her job title.

*McKenzie v. Potter*, No. Civ.A. 02-10727-DPW, 2004 WL 1932766 (D.Mass. Aug. 20, 2004)(to make out *prima facie* case, employee must do more than make claim that man was promoted over her, she must produce evidence which establishes by preponderance of evidence she suffered adverse employment action).

Ms. Jodoin also claims that she suffered an adverse employment action because Ms. Horton subjected her to a hostile work environment which materially changed the conditions of her employment[31].  As to this claim, Ms. Jodoin points to the following instances of harassment by Ms. Horton: (i) Ms. Horton walked down the hall with a mobile cart mocking how Ms. Jodoin turned her head to the side, which occurred in December 2005; (ii) Ms. Horton expressed impatience with Ms. Jodoin and belittled and demeaned her during a training session in the spring of 2006;  (iii) Ms. Horton stated in an October 25, 2006 e-mail to Ms. Despres that Ms. Jodoin's eye condition had come up as being a problem again and that a mobile cart set up was being explored which would not be cheap and would be a whole other issue; (iv) during a February 2007 meeting to discuss Ms. Jodoin's requests for accommodation, Ms. Horton commented that the computer systems were working "for the everyday normal person";  (v) In April 2007, Ms. Jodoin was testing a computer enlargement program when Ms. Horton commented that it should work, people who are almost blind use it; and (vi) in April 2007, Ms. Horton insinuated that Ms. Jodoin was fabricating errors about an LPN's performance.   Ms. Jodoin also contends that the following comments by Mr. Welch evidence a hostile work environment: at an unspecified time, Mr. Welch told Ms. Jodoin to "look outside the box" for a

---

[31] It remains an open question in this Circuit as to whether a hostile work environment claim lies under the ADA.  Both parties have assumed that such a claim exists and the First Circuit has inferred that it would recognize such a claim.  *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14 (1st Cir. 2006).  Therefore, for purposes of this Memorandum and Decision, I will assume the existence of such a claim.

solution to accommodate her disability and that perhaps she could not do the job anymore. *Pl's Opp.*, at pp. 5-7.

In order for Ms. Jodoin to succeed on this claim, she must establish " 'that the complained-of conduct was so severe or pervasive that it altered the terms of her employment' ". *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 19 (1st Cir. 2006)(citation to quoted case omitted). "'There is no mathematically precise test ' " which can be used to determine when the plaintiff has met her burden, rather the allegations and all the circumstances must be evaluated, considering " 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.' " *Id.* (citation to quoted case omitted).

Like the plaintiff in the *Carmona-Rivera* case, Ms. Jodoin's allegations for the most part focus on whether Baystate Health employees, in particular, Ms. Horton, were "rude and indifferent in their treatment of her and her disability." *Id.* However, the First Circuit has made clear that " 'rudeness ... standing alone, usually is not enough to support a hostile work environment claim.' " *Id.* (citation to quoted case omitted). Ms. Jodoin points to stray remarks over a six month period, some of which on their face, are simply statements of fact regarding her disability. While a couple of Ms. Horton's statements can be characterized as insensitive, they simply do not rise to the level of "ridicule, insult, or harassment such that a court could find behavior on the part of the defendants that was 'objectively and subjectively offensive, ... [behavior] that a reasonable person would find hostile or abusive.' " *Id.* (citation to quoted case omitted). Indeed, while in hindsight Ms. Jodoin now claims that the remarks were humiliating, according to her own deposition testimony, she did not find all of them offensive at the time

35

there were made.  Furthermore, she has not established the requisite discriminatory animus on

Ms. Horton's part to hold her individually liable under Chapter 151B.

Since I have found that Ms. Jodoin has failed to establish that the existence of a hostile

work environment, that is, that the complained of conduct was "so severe or pervasive that it

altered the terms of her employment", it is not necessary for me to address whether her having to

seek unpaid FMLA leave as a result of her blood pressure being out of control constituted an

adverse employment action.  Accordingly, I find that Defendants are entitled to summary

judgment with respect to this claim.

Ms. Jodoin also asserts that Baystate Health violated her rights under the ADA by failing

to engage in the required  interactive process[32].  Specifically, she alleges that Baystate Health

failed to act in good faith by obstructing or delaying the interactive process and by failing to

include her in the interactive process.  Applicable regulations provide that "'it may be necessary

for the covered entity [the employer] to initiate an informal, interactive process with the

qualified individual [the employee] with a disability in need of accommodation'.  Thus, once the

employer becomes aware of the disability, he is expected to engage in a meaningful dialogue

with the employee to find the best means of accommodating that disability".  *Tobin v. Liberty*

*Mut. Ins. Co.,* 433 F.3d 100, 108 (1st Cir. 2005)(quoting 29 C.F.R.

§1630.2(o)(3)(2005))(alterations in original)(internal citation omitted).  An employer's

obligation *vis a vis* the required interactive process is unclear– while the employer must

communicate with the individual, the employer need not "raise[] and discuss[] every conceivable

---

[32] The First Circuit has noted that a claim that the employer failed to engage in an "interactive process" is actually a subtheory of the plaintiff's reasonable accommodation claim. *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 n. 7 (1st Cir. 2005).

accommodation with the disabled employee ... the 'interactive process' is to be 'informal' and a means of *'potential'* reasonable accommodations' that could overcome the employee's disability". *Id.*, at 108-09.  "[L]iability for failing to adequately engage in the interactive process '... depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions.'" *Horn v. Southern  Union Gas Co.*, C.A. 07-142S, 2009 WL 462697 (D.R.I. Feb. 20, 2009) (quoting *Kvorjak  v. Maine*, 259 F.3d 48, 52 (1st Cir. 2001)).

Ms. Jodoin does not appear to argue that Baystate Health did not consider her accommodation requests; indeed, it appears that any such argument would be futile as Baystate Health ultimately provided Ms. Jodoin with all of her requested accommodations.  Instead, Ms. Jodoin argues that Baystate Health failed to involve her in the process and that Baystate Health unduly delayed in providing her the requested accommodations that would have permitted her to perform the essential functions of her job.

In support of her position, Ms. Jodoin contends that beginning October 2006 and November 2006, she made two verbal requests for a larger monitor because, as a result of her vision problems, she was having difficulty using a new electronic medical records system instituted at the Practice.  Ms. Jodoin further asserts that in a conversation with Ms. Horton on October 25, 2006, after initially stating that Baystate Health was not obligated to accommodate Ms. Jodoin, Ms. Horton told her that Baystate Health was attempting to determine whether it would be cheaper to get the new monitor or hire and train someone to take Ms. Jodoin's place. When Baystate Health did not respond to her oral requests, in December 2006, Ms. Jodoin filed a

formal written request for accommodation seeking a larger monitor.  Ms. Jodoin asserts that

Baystate Health did not provide any further status update as to any of these requests.

In February 2007, Baystate Health received a letter from Ms. Jodoin's attorney

addressing the Defendants' failure to provide Ms. Jodoin with a reasonable accommodation.

Thereafter, Ms. Horton called Ms. Jodoin into her office and told her the letter had been

forwarded to Baystate Health's Human Resources Department; Ms. Horton did not provide an

update concerning the status of the request.  On February 22, 2007, a meeting was held with Ms.

Jodoin, Ms. Horton and Baystate Health's ADA Coordinator.  Finally, Ms. Jodoin also asserts

that the Defendants delayed in providing her a lamp for her desk.  Ms. Jodoin first made the

request for a lamp in her December 2006 written request; she reiterated the request at the

February 22nd meeting.  The lamp was not provided until six weeks later when Ms. Horton

brought in a small lamp purchased at the Home Depot.  The larger monitors did not arrive until

March 31, 2007.  Other accommodations, such as the mobile cart and modified work desk

arrived around when or after Ms. Jodoin went out on leave.

I am troubled by Ms. Jodoin's assertion that Baystate Health did not keep her informed of

the steps it was taking concerning her requests and that the first time she was updated was the

February 22, 2007 meeting.  Ms. Jodoin's assertion  is contradicted by an entry created by Judy

Baird summarized a discussion she had with Ms. Jodoin on November 30, 2006, in which she

states that during a one on one meeting she asked Ms. Jodoin if the equipment modifications

proposed had been adopted.  Furthermore, there are multiple e-mails between Baystate Health

employees and/or vendors in early November 2006 discussing proposed modifications to Ms.

Jodoin's work area to accommodate a larger monitor.  Ms. Jodoin was copied on these e-mails

and acknowledges in her deposition testimony that she, in fact, received these e-mails.  Ms. Jodoin further acknowledges that there were group discussions during this period.  Although she could not state the exact number of conversations, she admits to having multiple conversations with Joe Welch and Judy Bair.[33]

Despite Ms. Horton's comment to Ms. Jodoin about Baystate Health needing to assess whether it would be cheaper to hire and train a new employee than provide the requested accommodation, it is clear from e-mail correspondence among Baystate Health employees that her request for a larger monitor had been approved as early as October 2006.  However, there were numerous issues attendant to putting a larger monitor into the workspace which had to be addressed.  In the interim, Baystate Health attempted to work with the company that provided the medical records system software to determine whether the font size could be increased so Ms. Jodoin would have an easier time reading it.  While there was at one point a few week delay in which Baystate Health may have left the issue rest with a vendor, it is clear that from October 2006 until the 21" monitor was ordered in February 2007, their were continuous e-mails and discussions among Baystate Health employees about the type and size of monitor which would best assist Ms. Jodoin, the set up which should be employed, whether a mobile cart was feasible, *etc.*  One of the vendors provided a wall mount/with arm so that Ms. Jodoin's monitor could be brought closer to her.  Baystate Health, at times with Ms. Jodoin, continued to investigate various wall mounts to determine which would work best for her.

---

[33] Although testifying on multiple occasions that such conversations took place, when pushed for specifics, Ms. Jodoin testified that she did not remember.  It is not the purview of this Court to make credibility determinations at this stage and, therefore, this Court will not draw any inferences from what appear to be numerous instances in which Ms. Jodoin appears to have suffered a loss of memory when it comes to material facts or issues.

Ultimately, Baystate Health supplied Ms. Jodoin with larger monitors, reconfigured her workspace, provided magnification software, provided her with an a wall mount to bring the monitor closer until a larger monitor could be obtained, provided her a desk lamp and provided a mobile cart to transport the larger monitor from place to place.   Thus, even accepting Ms. Jodoin's contention that Baystate Health did not include her in the decision making process concerning her requests for accommodation, it cannot be disputed that Baystate Health acted on her requests.  On this record, I find as a matter of law that Ms. Jodoin has failed to support her contention that Baystate Health failed to engage in a meaningful dialogue with her, or unduly delayed or otherwise obstructed the interactive process.  Furthermore, while Ms. Horton may have made insensitive comments concerning her condition and Baystate Health's obligation to accommodate her, Ms. Jodoin has failed to cite to any record evidence which would support a finding that Ms. Horton was the cause of any delays in accommodating her requests.

Ms. Jodoin also claims that the Defendants retaliated against her for requesting reasonable accommodations.  Specifically, Ms. Jodoin asserts that Baystate Health retaliatory conduct against her as evidenced by: (i) forcing her to take a day off with pay or use a vacation or personal day when a snowstorm was forecast, (ii) reprimanding her for returning five minutes late from work, without reprimanding the co-worker she was with; and (iii) failing to engage in the interactive process after she requested reasonable accommodation.[34]

---

[34] Ms. Jodoin does not explain how the last claim differs from her reasonable accommodation claim that Baystate Health's failed to engage in the interactive process which I have already resolved in Baystate Health's favor.  For that reason, I will not discuss this claim any further and instead, will focus on her claim that Baystate Health retaliated against her by selectively disciplining her. *Lucas v. WW Grainer, Inc.*, 257 F.3d 1249, 1261 (11th Cir.2001) (contention that Defendant retaliated by failing to reasonably accommodate and failing to engage in interactive process "merely reclothes ... [an] ADA discrimination claim", which court had already rejected).

The ADA provides that: "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful [hereunder] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [hereunder]." 42 U.S.C. § 12203(a).  The First Circuit has held that requesting an accommodation, without filing a formal charge or engaging in other specific behaviors listed in § 12203(a), is nonetheless behavior protected from retaliation. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003).   Furthermore, "[a]n ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability claim."  *Freadman v. Metropolitan Property and Casualty Ins. Comp,* 484 F.3d 91, 106 (1st  Cir. 2007).

To establish a prima facie claim of retaliation, the plaintiff must show s/he was engaged in protected conduct, that s/he suffered an adverse employment action, and that there was a causal connection between the adverse employment action and the conduct. *Id.*  Once a prima facie case of retaliation is established, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for its employment decision. If the defendant provides a legitimate reason, then the ultimate burden shifts to the plaintiff to show that the defendant's proffered reason is pretext masking retaliation. *Id.*

In support of her claim that Defendants unlawfully retaliated against her, Ms. Jodoin points to two incidents: Ms. Horton requiring her to take a personal or vacation day when a snowstorm was forecast, and Ms. Horton reprimanding her for returning five minutes late from lunch, and not reprimanding her co-worker who was with her.   However, because of the severity of the storm, the Practice was closed for the day and Ms. Jodoin was paid.  Therefore, she did not suffer any adverse employment action. *See Whittaker v. Northern Illinois Univ.,* 424 F.3d 640 (7th Cir. 2005)(plaintiff who never served three day suspension without pay did not suffer

adverse employment action).  As to the lunch incident, other than a reprimand from Ms. Horton,

Ms. Jodoin has asserted that any further punishment, such as a dock in pay or demotion,

occurred.  A reprimand which does not result in any change in the terms or conditions of

employment is not an adverse employment action.  *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594

(7th Cir. 2009)(disabled employee who received two written reprimands when other employees

were not reprimanded did not suffer adverse employment action).  Because Ms. Jodoin did not

make out a *prima facie* case, Baystate Health is entitled to summary judgment on Ms. Jodoin's

retaliation claim.

### *Plaintiff's Claim Under The Family Medical Leave Act*

Ms. Jodoin asserts that Baystate Health violated her rights under the FMLA by refusing

to  approve her request for FMLA leave until she changed her reason for the leave from job

related stress to congenital nystagmus.  Ms. Jodoin does not contend that she did not receive the

entire amount of leave to which she was entitled.

The FMLA provides that an eligible employee shall be entitled to a total of twelve weeks

of leave during any twelve-month period because of a serious medical condition which inhibits

the employee from working.  29 U.S.C. § 2612(a)(1)(D) (1994).  A "serious health condition," is

defined as "an illness, injury, impairment, or physical or mental condition that involves (A)

inpatient care in a hospital, hospice, or residential medical facility; or (B) continuing treatment

by a health care provider."  *Id.* at § 2611(11).

Interference claims under the FMLA are distinguishable from FMLA discrimination or

retaliation claims. An interference claim involves the denial of substantive rights that the FMLA

provides for employees, while discrimination and retaliation claims involve violations of FMLA

provisions that prohibit specificy conduct by employers. *See Hodgens v. Gen. Dynamics Corp.*,

144 F.3d 151, 159-60 (1 st Cir.1998).  As to interference claims, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA." *Id.* at 159. Such claims include the denial of substantive rights, as well as other actions by an employer that prevent or even "deter" employees from exercising their rights. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir.2006).

To prevail on her claim of interference with her FMLA rights, a plaintiff must prove: (1) that she was an eligible employee under the FMLA; (2) that her employer was a covered under the FMLA; (3) that she was entitled to FMLA leave; (4) that she gave her employer sufficient notice of her intent to take such leave; and (5) that her employer denied her benefits to which she was entitled. *Ridings v. Riverside Medical Center*, 537 F.3d 755, 761 (7th Cir.2008).   However, there is no relief under the interference provision of FMLA unless the employee has been prejudiced by a violation, that is, the employer is liable only for compensation and benefits lost by reason of violation. *Ragsdale v. Wolverine Word Wide, Inc.*, 535 U.S. 81, 89, 122 S.Ct. 1155 (2002).

The crux of Jodoin's claim is unclear: she does not allege that Baystate Health denied her rights under the FMLA-- indeed, it is clear that Baystate Health gave Ms. Jodoin *far more* than the twelve weeks of leave required by the FMLA.  Furthermore,  she concedes that at the time she was terminated, more than a year after she first went on leave, she was not able to return to work.  Clearly, Baystate Health did not deny her any rights which she was due under the FMLA. Furthermore, even if I were to assume that Baystate Health interfered with Ms. Jodoin's exercise of her rights under the FMLA by requiring her to change the basis for her requested leave, there is no evidence that she was prejudiced thereby. *Cf. Goulette v. Port Huron Hosp.*, Civ.Act. No. 08-CV-12459, 2010 WL 750170 (E.D.Mich. Mar. 3, 2010)(plaintiff who was given all FMLA

leave to which she was entitled for one of three listed medical diagnoses had no cause of action

against employer for failing to recognize a second diagnosis as reason for such leave).

Therefore, Baystate Health is entitled to summary judgment on this claim.[35]

### *Plaintiff's Claim Under The Employee Retirement Income Security Act ("ERISA")*

Ms. Jodoin applied for LTD benefits in August 2007.  In her application, Ms. Jodoin

indicated that she was suffering from "Congenital Nystagmus, Decrease Vision, Anxiety-

Depression".   Ms. Jodoin never submitted medical records relating to her anxiety or depression

and at one point, she told a Baystate Health (or Baystate DMS) employee that she did not intend

to pursue LTD benefits relating to an emotional condition.  In any event, the medical information

provided to Baystate DMS regarding Ms. Jodoin's claim for LTD benefits related primarily to

her congenital nystagmus and related loss of vision[36].  Therefore, Ms. Jodoin's claim proceeded

solely on the issue of whether she was entitled to LTD benefits relating to that medical

condition.  Ms. Jodoin was granted LTD benefits by Baystate DMS at fifty percent (50 %) of her

former salary.  Baystate DMS denied benefits at the enhanced seventy percent (70%) level.  Ms.

Jodoin contends that Baystate DMS erred by denying her benefits at the enhanced level.

Baystate Health argues that it is entitled to summary judgment on this claim, first, because Ms.

---

[35] Ms. Jodoin does not argue that requiring her to designate congenital nystagmus as the reason for taking leave under the FMLA led to the denial of the full LTD benefits to which she was entitled.  Even if she had, she would be unable to establish any prejudice: as discussed below, Ms. Jodoin was denied LTD benefits at the enhanced seventy (70%) level because Baystate DMS determined that her congenital nystagmus was a pre-existing condition at the time she elected to receive enhanced benefits.  Thus, the reason for her taking FMLA leave on May 15, 2007, is irrelevant to Baystate DMS's determination, that is, because Baystate Health denied her claim solely because it determined she had a pre-existing condition, her request for enhanced benefits would have been denied regardless of the medical condition which initially led to her going on FMLA leave.

[36] The medical records forwarded to Baystate Health also included general medical information unrelated to her congenital nystagmus, however, none of the medical records related to her suffering from anxiety or depression. In any event, Ms. Jodoin does not contest that the sole medical reason for which she sought LTD benefits was the worsening of her vision.

Jodoin failed to exhaust her administrative remedies with respect thereto, and second, because the record amply supports the decision to deny her benefits at the enhanced level.

Initially, I will address Baystate Health's argument that this claim should be denied because Ms. Jodoin did not timely appeal Baystate DMS's denial of benefits at the higher level. A plaintiff seeking judicial review of the denial of his/her right to ERISA benefits must first exhaust his/her administrative remedies. *See  Shaffer v. Foster-Miller, Inc.*, 650 F. Supp.2d 124, 127 (D.Mass. 2009).  Generally, failure to file a timely administrative appeal will result in a dismissal of a plaintiff's claim for failure to exhaust administrative remedies, unless the claimant can establish that fully exhausting his/her remedies would have been futile. *Madera v. March USA, Inc.*, 426 F.3d 56, 62 (1st Cir. 2005)(futility is exception to exhaustion requirement).  In *Terry v. Baker*, 145 F.3d 28, (1st Cir. 1998), the First Circuit stated that a claimant who files an appeal late, has procedurally defaulted on his/her claim.[37] In *Terry,* the plan administrator denied the claim for failure to file a timely appeal; as a courtesy, the plan administrator then reviewed the appeal on its merits and upheld the denial of the claim.  The First Circuit found that it was reasonable for the administrator to deny the appeal as the result of the claimant's procedural default.  *Id.*

Ms. Jodoin's delay in filing her appeal was not *de minimis.*  Therefore, had her appeal been denied as untimely, I would not hesitate to uphold the decision denying her benefits at the enhanced level.  Ms. Jodoin argues that since her appeal was considered, Baystate Health's assertion that her claims should be dismissed for failure to exhaust administrative remedies lacks

---

[37] At least one court has held that where the administrator addresses an untimely appeal on its merits and denies the appeal, the plaintiff has established that fully exhausting her claim would have been futile and therefore, the exhaustion requirement should be waived.  *Ayers v. Maple Press. Co.*, 168 F.Supp.2d 349 (M.D.Pa. 2001).  It is not at all clear to me that th the First Circuit would agree with this finding.

merit.  Although Ms. Jodoin has failed to provide any further legal argument or support for her position, I will assume that she is essentially arguing that by considering her appeal on its merits and not denying the claim for failure to exhaust, Baystate Health waived it affirmative defense with respect thereto.   Because I find that the parties have failed to adequately address this issue and because I further find that Baystate Health is not entitled to summary judgment with respect to this claim reviewed on its merits, I will defer making a final ruling on this issue until trial.

Before addressing Ms. Jodoin's claim that Baystate Health wrongly denied her claim at the seventy percent (70 %) level, the Court must first determine the appropriate standard of review to apply the administrator's decision.  In her Amended Complaint, Ms. Jodoin asserts that this Court should apply *de novo* review.  However, in her memorandum in opposition to the Defendants' motion for summary judgment, she does not address the proper legal standard of review which this Court should apply– this despite the fact that in its memorandum in support of its motion for summary judgment Baystate Health includes a comprehensive discussion as to why a deferential rather than *de novo* standard of review should be applied. Although not stated, I assume that Ms. Jodoin takes the position that a *de novo* standard of review should be applied because Baystate Health has a structural conflict of interest– that is, Baystate Health has a self-funded disability plan for which it has the dual responsibility of determining an employee's eligibility for benefits and paying the benefit award.  For the reasons set forth below, I find that a this Court must apply a deferential standard of review in determining whether Baystate Health properly denied Ms. Jodoin benefits at the enhanced level.

"When an ERISA plan gives the administrator the discretion to determine eligibility for benefits (as in this case), a reviewing court must uphold that decision unless it is 'arbitrary, capricious, or an abuse of discretion.'" *Cusson v. Liberty Life Assur. Co. Of Boston*, 592 F.3d

215, 224 (1ˢᵗ Cir. 2010)(citation to quoted case omitted).  The court must take a number of different considerations into account and whether there is a conflict is but one factor which the court must consider when determining there is an abuse of discretion. *Id.*  That a conflict exists may, "under certain circumstances, be accorded extra with in the court's analysis" and therefore, "' courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decision making process against the potentially pernicious effects of structural conflicts'". *Id.* (citation to quoted case omitted).  The claimant bears the burden of showing that a conflict influenced the administrator's decision.  *Id.*, at 225.  As noted above, Ms. Jodoin has simply assumed that *de novo* review applies.  Neither party has addressed whether Baystate Health's internal procedures are sufficient to assure the review process is free from conflict and Ms. Jodoin's argument in favor of overturning the benefits determination does not suggest that any conflict of interest played a role in Baystate Health's decision.  Given that Ms. Jodoin bears the burden of proof on this issue, I find that no special weight should be given to the conflict and therefore, I will consider as one of multiple factors in determining whether Baystate Health's denial of Ms. Jodoin's enhanced benefit "was 'reasoned and supported by substantial evidence'". *Id.* (citation to quoted case omitted)[38].

On October 9, 2007,  Baystate DMS sent Ms. Jodoin notification that her LTD benefits had been approved, effective August 13, 2007.  The notice indicated that her LTD benefit would be paid at the fifty percent (50%) rate.  In a separate notice dated as of the same date, Baystate DMS informed Ms. Jodoin that her claim was being denied at the seventy percent (70%) benefit level because it had been determined that her present condition had been caused or contributed to

---

[38]I will note that Baystate Health took at least one insulating step by procuring an outside ophthalmologist during the appeals process.

by a pre-existing condition.  The notice further specified that in denying her claim at the

enhanced level, Baystate DMS had relied on the following:

- Ms. Jodoin's coverage at the seventy percent (70%) level became
  effective on January 1, 2007;

- She claimed disability within twelve months of the effective date of her being
  covered at the seventy percent (70%) level[39];

- A review of her medical records from several providers indicates that she did not
  go treatment free during the period from January 1, 2007 through June 30, 2007;

- She had received treatment within three months of January 1, 2007 (the effective
  date of her coverage)– specifically: (1) medical information from Dr. Kereshi
  dated November 16, 2006 indicated that she was having trouble with her
  computer due to her nystagmus for which he recommended botox injections and a
  nystagmus support group; (2) medical information from Dr. Mason, an ENT
  specialist, who on December 4, 2006, treated Ms. Jodoin for dizziness which he
  related to her nystagmus and for which he referred her to a neurologist; and (3)
  medical information from Dr. Sorrell, dated December 8, 2006, which indicated
  that Ms. Jodoin's congenital nystagmus had not bothered her until the past year
  and diagnosed chronic headaches secondary to her torticollis, ear plugging and
  worsening of her congenital nystagmus, possibly due to brainstem dysfunction,
  for which he ordered brainstem auditory evoked response testing (which was
  normal).  The decision was also made based on a medical review performed by
  Dr. Garb which summarized the treatment Ms. Jodoin had received in the three
  months prior to January 1, 2007.

- Based on the review of Ms. Jodoin's medical records, it was determined that she
  had received treatment for her congenital nystagmus on 11/16/06, 11/20/06,
  12/4/06, 12/8/06 and 12/15/06.

The notice further set forth the procedure by which Ms. Jodoin could seek a review of the denial

of her claim at the enhanced benefit level, including the applicable appeals period and invited her

to include any further documentation which would support her claim.

---

[39]The notice indicates that Ms. Jodoin's disability began as of May 15, 2007.  As noted in my discussion of
Ms. Jodoin's FMLA claim, even if, as she contends, Baystate Health  required her to list congenital nystagmus as the
medical condition for which she required leave under the FMLA effective May 15, 2007, despite the fact that she
was actually suffering from hypertension and high blood pressure, it remains undisputed that the disability for which
she claimed LTD benefits, *i.e.,* congenital nystagmus, began prior to January 1, 2008.

On June 1, 2008, Ms. Jodoin filed a request for review of the denial of her benefits at the enhanced level, stating that the sole reason she had increased her benefit level was because of her husband's loss of employment and not because there was any reason to believe that her vision had worsened.  She also appears to argue that the apparent reason that her condition worsened, *i.e.,* brain lesions, was not discovered until February 28, 2008.   On August 22, 2008, the Baystate LTD Appeals Board denied her appeal on the grounds that Baystate DMS was correct in its initial determination that she was not entitled to enhanced benefits.

Ms. Jodoin applied for enhanced benefits in October 2006, to be effective January 1, 2007, that is, she applied to be eligible for seventy percent (70%) disability benefits rather than the fifty percent (50%) rate that would otherwise apply.  Pursuant to Baystate Health's LTD Plan, Ms. Jodoin would not be entitled to the enhanced benefit with respect to any disability that began before January 1, 2008 where the disability was caused by, contributed to by, or resulted from a "Pre-Existing Condition."  However, the exclusion would not apply if *one* of the following conditions was met:

> (1)      during the three (3) months just prior to [January 1, 2007], [she] did not receive medical treatment, consultation, care or services (including diagnostic measures) for the Pre-Existing Condition, and did not take prescribed drugs or medicines for the Pre-Existing Condition during that three (3) month period, and did not have symptoms for which an ordinarily prudent person would have consulted a health care provider in that three (3) month period; or

> (2)      during the twelve (12) month period beginning on [January 1, 2007], there was a period of six (6) consecutive months during which [she] did not consult with a health care provider or receive care, treatment or services (including diagnostic procedures) or take prescribed drugs or medicines, for the Pre-Existing Condition, and did not during that six (6) month period have symptoms for which an ordinarily prudent person would have consulted a health care provider.

It is uncontested that Ms. Jodoin's disability began before January 1, 2008.  The next step is to establish whether the denial of enhanced benefits by Baystate DMS/Baystate Health LTD Appeals Board was reasonable.  Ms. Jodoin contends that the denial of benefits at the enhanced level was in error because it was based on three doctors visits she had in the fall of 2006 and she did not consult with a health care provider or receive any care or treatment in the first six months following the effective date (January 1, 2007).

ERISA guidelines require that the benefits plan provide  written notice to a plan participant whose claim has been denied setting forth the specific reasons for the denial "in a manner calculated to be understood by the participant" and must afford the participant a reasonable opportunity for full and fair review of the denial of such claim. *See* 29 U.S.C. §1133; 29 C.F.R. 2560.5031(f)-(h).  While sparse or conclusory reasons for denying benefits do not meet ERISA's requirements, *Jorstad v. Connecticut General Life Ins., Co.*, 844 F.Supp. 46 (D.Mass. 1994), "[s]o long as the plan participant is provided a sufficient explanation to formulate challenges to the denial, it is not necessary for an administrator to provide 'the reasoning behind the reasons'". *Mercier v. Boilermakers Apprenticeship and Training Fund*, Civ. Act. No. 07-11307-DPW, 2009 WL 458556 (D.Mass. Feb. 10, 2009)(citation to quoted case omitted).       While the initial denial by Baystate DMS set forth a detailed explanation of why Ms. Jodoin did not meet the first exclusion (she had received medical treatment or consulted with health care providers concerning her condition during the three months prior to January 1, 2007), it does not include a detailed explanation as to why she does not meet the second exclusion.  Instead, the denial simply indicates that based on a review of Ms. Jodoin's medical records, she received medical treatment for her disabling condition during the period from

January 1, 2007 through June 30, 2007.   In denying her appeal, the Baystate LTD Appeals

Board simply adopts the findings in the original denial. Ms. Jodoin does not contend that the

notice provided by Baystate DMS was insufficient to permit her to obtain review of the denial of

her claim.   Instead, she simply challenges the finding by Baystate DMS/Baystate LTD Appeals

Board that a pre-existing condition disqualified her from receiving benefits at the enhanced level.

Specifically,

Ms. Jodoin asserts that she did not receive any care or treatment for her disabling condition

during the six month period from January 1, 2007 through June 30, 2007.   She contends that the

only treatment she received during this period was for headaches and points out that she did not

experience any sudden loss of vision until the summer of 2007.   Ms. Jodoin does not challenge

the finding that she was treated for her disabling condition during three months preceding the

effective date of her enhanced coverage, *i.e.,* January 1, 2007.[40]   Baystate Health's brief, on the

other hand, addresses only whether Baystate DMS/Baystate LTD Appeals Board properly

determined that Ms. Jodoin had received treatment during the three months prior to January 1,

2007; it does not address whether there is evidence in the record which was before Baystate

DMS to support a finding that she received treatment for her disabling condition during the six

month period from January 1, 2007 through June 30, 2007.

      Baystate DMS made the initial determination that based on the review of the medical

information before it, Ms. Jodoin had received treatment during the six month period following

January 1, 2007.   However, the only medical records possessed by Baystate DMS/Baystate

---

[40]Based on the medical records relied on by Baystate DMS as detailed in the October 9, 2007 denial letter, Ms. Jodoin would be hard pressed to establish that this finding was an abuse of discretion.   For example, the cited medical records indicate that Ms. Jodoin was experiencing problems seeing her computer and driving due to her congenital nystagmus.

Health LTD Appeals Board which have been provided to this Court for this time period are a follow-up consultation with Dr. Kereshi addressing Ms. Jodoin's history of chronic headaches. From Dr. Kereshi's notes, it appears that Ms. Jodoin's headaches may be collaterally related to her congenital nystagmus, but it does not appear that he was treating Ms. Jodoin for her congenital nystagmus, *per se*.  There is also some mention of Ms. Jodoin's congenital nystagmus in the medical records from the emergency room visit on May 14, 2007, however, it is unclear that she received treatment or services for this condition at that time.  Dr. Garb's summary, which was referred to in Baystate DMS's denial letter, mentions a an appointment with Dr. Ballon in June 2007, however, it does not appear that the appointment was related to Ms. Jodoin's congenital nystagmus.  Furthermore, while Dr. Garb specifies that he believes her loss of vision is directly related to Ms. Jodoin's congenital nystagmus, he acknowledges that her vision loss was not documented until July 2007 and does not specify any dates for which she received treatment or services for this condition from January 1, 2007 through June 30, 2007. Additionally, there is a question of fact as to whether the medical records and other evidence suggests that Ms. Jodoin may have suffered from symptoms during this period for which a reasonably prudent person would have sought treatment.

On this record and based on the briefing of the parties, I cannot find, as a matter of law, that the plan administrator's determination should be upheld, nor can I find, as a matter of law, the determination to deny benefits at the enhanced level was an abuse of discretion.  Therefore, I am denying summary judgment with respect to this claim.

*Plaintiff's Claim Under The Massachusetts General Law ch. 214 § 3A*

Under Massachusetts General Laws c. 214 § 3A "[a]ny person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without [her] written consent may bring a civil action … against the person so using his name, portrait or picture, to prevent and restrain the use thereof; and may recover damages for any injuries sustained by reason of such use."   "The statute protects an individual's interest in preventing `the commercial value of one's name, portrait, or picture appropriated [for] the benefit of another'".   *Albright v. Morton,* 321 F.Supp.2d 130 (D.Mass. 2004)(quoting *Tropeano v. Atlantic Monthly Co.,* 379 Mass. 745, 749 (1980)).   Where an individual's picture is published "for purposes other than taking advantage of [his/her] reputation, prestige, or other value associated with [his/her], for purposes of publicity," there has been no misappropriation. *Tropeano v. Atlantic Monthly Co.,* 379 Mass. 745, 749 (1980).

A photograph of a group of Baystate Health employees, including Ms. Jodoin, was used in a mailing by Baystate Health informing area residents of its new address. Even if I assume that Ms. Jodoin has established that Baystate Health's incidental use of her image was for advertising or trade purposes, she has failed to cite to any record evidence which would establish that Baystate Health benefitted financially from using her image. *Id.*   Finally, Ms. Jodoin nor has established that she was damaged by Baystate Health's incidental use of her image. The former is not surprising given that Ms. Jodoin's image did not add any particular value to the photograph; the latter is not surprising given that Ms. Jodoin apparently had no objection to the use of her photograph prior to her eventual termination.   Baystate Health is entitled to summary judgment on this claim.

*Plaintiff's Claims For Violation Of Mass.Gen.L. Ch. 214 §1B*

53

Ms. Jodoin asserts that her privacy was violated under Mass.Gen.L. ch. 214 § 1B, which provides that "[a] person shall have a right against unreasonable, substantial or serious interference with [his/her] privacy".  Mass. Gen. Laws ch. 214, § 1B. "In order for a plaintiff to succeed on an invasion of privacy claim, he must prove not only that the defendant unreasonably, substantially and seriously interfered with his privacy by disclosing facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so." *Martinez v. N.E. Med. Ctr. Hosps., Inc.*, 307 F.Supp.2d 257, 267 (D.Mass. 2004)

Ms. Jodoin contends that Ms. Horton violated her right to privacy by sharing her personal medical information.  Specifically, Ms. Jodoin alleges that Ms. Horton published information on her computer's calendar, which could be viewed by others in the office.  The information was a notation "NJ disability meeting", the date and the location. This claim merits little discussion. Even if people associated "NJ" with Ms. Jodoin, no private information was shared.  The nature of the disability is not mentioned and frankly, somebody viewing the entry would not even assume that it was referring to a meeting concerning Ms. Jodoin's disability.  Anybody viewing the entry is equally likely to have assumed that Ms. Horton was discussing disability issues in general, or the disability of an unnamed employee.

Ms. Jodoin makes further allegations that Ms. Horton shared information about her to other Baystate Health employees.  First, such conclusory allegations, without more, are insufficient to state a claim.   Second, Ms. Jodoin cannot establish that the circumstances under which information concerning her disability was disseminated was unreasonable or of a severity to permit recovery. *See Bratt v. Int'l Bus. Machs. Corp.*, 392 Mass. 508, 512-13, 467 N.E.2d 126, 131 (1984)( in determining whether there violation of Ch. 214 § 1B has occurred in employment

context, it is necessary to balance employer's legitimate business interest in obtaining and publishing information against substantiality of intrusion on employee's privacy resulting from disclosure).  For the reasons set forth above, Defendants' motion for summary judgment with respect to this claim shall be allowed.

### Conclusion

1.      The  Motion For Summary Judgment (Docket No. 34) is ***allowed***, *in part*, and ***denied***, *in part*, as provided in this Order and Memorandum of Decision;

2.      The Motion To Strike Portions Of The Affidavit Of Plaintiff Nancy Jodoin In Support Of Her Opposition To Defendants' Motion for Summary Judgment (Docket No. 51) ***allowed***, *in part*, and ***denied***, *in part*, as provided in this Order and Memorandum of Decision; and

3.      The Motion To Strike Portions Of The Affidavit Of  Elaine Miner In Support Of Plaintiff's Opposition To Defendants' Motion For Summary Judgment (Docket No. 52) ***allowed***, *in part*, and ***denied***, *in part*, as provided in this Order and Memorandum of Decision.


**/s/ Timothy S. Hillman**
TIMOTHY S. HILLMAN
MAGISTRATE JUDGE